CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
JUN 0 5 2009
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | |
|---|---|
| KHALIL BAAPIR, ) | Case No. 5:08cv00059 |
| ) | |
| Plaintiff ) | REPORT AND |
| v. ) | RECOMMENDATION |
| ) | |
| MICHAEL J. ASTRUE, ) | By: Hon. James G. Welsh |
| Commissioner of Social Security, ) | U. S. Magistrate Judge |
| ) | |
| Defendant ) | |

The plaintiff, Khalil Baapir, brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of the Commissioner of the Social Security Administration ('the agency") denying his claims for a period of disability insurance benefits ("DIB") and for Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416 and 423 and 42 U.S.C. §§ 1381 *et seq.*, respectively. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

The Commissioner's Answer was filed on December 3, 2008 along with a certified copy of the administrative record ("R.") containing the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. By order of referral entered two days later, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

On appeal, the plaintiff contends that the combination of his physical [1] and mental [2] impairments have rendered him disabled since June 2004 and that the adverse final decision of the Commissioner resulted from a failure of the administrative law judge ("ALJ") to give the requisite decisional weight to the opinions of treating physicians and a consulting examiner. Each party has moved for summary judgment; no written request was made for oral argument, [3] and the case is now before the undersigned for a report and recommended disposition.

## I.   Summary Recommendation

Based on a thorough review of the administrative record and for the reasons herein set forth, it is recommended that the plaintiff's motion for summary judgment be denied, the Commissioner's motion for summary judgment be granted, and an appropriate final judgment be entered affirming the Commissioner's decision denying benefits.

## II.   Standard of Review

The court's review in this case is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to a period of DIB or to SSI. "Under the . . . Act, [a reviewing court]

---

[1] The plaintiff's primary physical complaints include chronic left shoulder pain and dysfunction resulting from a left chest gunshot injury, headaches, dizziness, and gastrointestinal reflux disease.

[2] The plaintiff's mental health complaints include a depression/anxiety disorder and a somatoform disorder.

[3] Paragraph 2 of the court's Standing Order No. 2005-2 requires that the plaintiff in a Social Security case must request oral argument in writing at the time his or her brief is filed.

2

must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3$^d$ 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3$^d$ 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3$^d$ at 176 (quoting *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* (*quoting Craig v. Chater*, 76 F.3$^d$ at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2$^d$ 396, 397 (4th Cir. 1974). The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review. *See Island Creek Coal Company v. Compton*, 211 F.3$^d$ 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

III.    Administrative History

The record shows that the plaintiff's applications allege a disability beginning June 28, 2004 due to the residuals of a gunshot wound, "liver problems," dizziness, and depression. (R.81, 86,94-95,97,105-107.) His claims were denied both initially and on reconsideration, [4] and an administrative hearing on his applications was held on February 1, 2007 before an ALJ. (R.19,367-374,387-432.) The plaintiff was present, testified, and was represented by counsel. (R.19,387-412.)

---

[4] On reconsideration the plaintiff added "headache" and "pain" as additional bases of his disability. (R.122-131.)

3

The plaintiff's wife also testified in support of her husband's applications (R.19,412-424), and by video conferencing vocational testimony was provided by Bonnie Martindale. (R.19,424-430).

Utilizing the agency's standard sequential evaluation process,[5] the plaintiff's claims were denied by written administrative decision dated March 9, 2007. (R.19-31.) *Inter alia*, the ALJ made the following findings: (1) the plaintiff's "anxiety and/or depression" imposed no more than mild functional limitations and was not a "severe" condition within the meaning of the regulations;[6] (2) the plaintiff's other conditions, either singularly or in combination, did not meet or medically equal the severity of a listed impairment;[7] (3) the plaintiff retained the functional ability to work at a sedentary exertional level[8] which did not require exposure to hazardous conditions, which required an ability only to remember and complete short, simple instructions; which could be performed by

---

[5] To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of impairments found at 20 C.F.R. Part 4, Subpt. P, Appx. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §.404.1503(a); *Hall v. Harris,* 658 F.2$^d$ 260 (4th Cir. 1981)

[6] Quoting *Brady v. Heckler*, 724 F.2$^d$ 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2$^d$ 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."

[7] The adult impairments listed in 20 C.F.R. Part 404, Subpart P, Appx. 1, are descriptions of approximately 125 physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a [person] to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. *See* Social Security Ruling (SSR) 83-19." Sullivan v. Zebley 493 U.S. 521, 529-530 (1990).

[8] *"Sedentary work"* is defined in 20 C.F.R. § 404.1567(a) and § 416.967(a) to involve lifting no more than 10 pounds at a time and occasionally carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of standing and walking is often required in carrying-out job duties, and jobs are classified as sedentary if walking and standing are required occasionally and other sedentary criteria are met.

an individual with a moderately limited ability to understand, remember and complete detailed instructions, and which could be performed by an individual with a slight limitation in his ability to interact with supervisors, co-workers and others; (4) the plaintiff was unable to perform any past vocationally relevant work; and (5) the plaintiff possessed the residual functional ability to perform the demands of a number of representative jobs, including hand packager, surveillance monitor, and inspector/table worker. (R.20-31.)

After the ALJ's issuance of his adverse decision on March 9, 2007, the plaintiff made a timely request for Appeals Council review and submitted several additional mental health records.[9] (R.14,376-387.) His request was denied (R.6-9), and the decision of the ALJ now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981.

IV.     **Facts and Analysis**

The record in this case shows that the plaintiff was born in 1963 and was forty-three years of age [10] at the time of the administrative hearing. (R.30,93,412.) His education was marginal, but he can speak and understand English well enough to make himself understood. (R.30,93-94,393-394,

---

[9] This submission consists of the following Rockingham Community Service Board records: an office note of the plaintiff's May 8, 2006 request for services (R.379), notes related to a "brief" intake interview on May 25, 2006 containing an "anxiety disorder, NOS" diagnosis (R.382-387), notes of an April 22, 2007 intake update containing a "provisional" generalizes anxiety disorder diagnosis (R.377-378,380-381), and a non-diagnostic follow-up appointment note dated May 4, 2007 (R.376).

[10] At this age the plaintiff is classified as a "*younger person*," and pursuant to the agency's regulations age is generally considered not to affect seriously a younger person's ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.920(c).

5

425.) He last worked in June 2004, and his past relevant work was primarily as an airline porter, a job that was unskilled and medium in exertional level. (R.30,399-400,412.)

The plaintiff's medical records for the period between March 23, 2003 and December 2006 show that he sought emergency room or other outpatient treatment for diverse corporeal complaints on approximately thirty-eight separate occasions from more than a dozen different health care providers. (R.132-235,239-268,282-283,292-321,336-345,359-365.) His physical complaints included chronic headaches, hand rashes, chronic dizziness, back pain (due to pushing a wheel chair), chronic abdominal pains, persistent generalized fatigue and weakness, shoulder pain, fainting spells, chest pain, ear infection, rectal pain, and "feeling strange" after completing a stress test.

Multiple clinical and diagnostic tests during the same time period, however, failed to establish any underlying physiological basis for those of his complaints which were of a recurring nature. For example, on August 24, 2004 a clinical examination demonstrated no neurological abnormality. (R.175.) An EMG three days later was "normal." (R.171-173.) An EEG in early September was "normal." (R.168-169.) Three ear examinations between October and December were unremarkable and demonstrated "excellent hearing." (R.210,216-223.) A brain MRI in December 2004 was "normal." (R.211.) A consultive medical examination in February 2005 demonstrated no neurological or musculoskeletal abnormality. (R.202-208.) The results of a fourth ear examination in February were "unchanged." (R.208.) A twelve minute stress test in April 2005 did not reproduce any chest pain or other abnormality. (R.247-248,306.) Despite his claim of a "bad liver," the results of liver function testing in April and again in June showed only "mild" or "slightly" elevated liver enzymes. (R.239,282-283, 307-308.) In June 2005 the results of a blood

6

sugar test were "normal." (R.307,309.) In March 2006 a CT of the head demonstrated no intracranial mass or other abnormality. (R.343.) A cardiac study in December 2006 demonstrated a normal sinus rhythm, and routine laboratory studies at the same time similarly suggested no medically significant abnormality. (R.363-365.)

In addition to his multiple somatic concerns, his medical records show that on two occasions in June 2003 he complained of anxiety, "anger" problems, and sleep difficulties. (R.141-142.). For the next two years, however, his medical records contain no mention of any significant mental health complaint. The next mention was in June 2005, when Dr. Mark Warner (Harrisonburg Medical Associates) noted that the plaintiff appeared to be "somewhat anxious" (R.305-306). At the time, however, the plaintiff denied either anxiety or worry. (R.305-306.)

It was not until ten months later, in April 2006, that the plaintiff was for the first time referred to a mental health specialist. Harrisonburg-Rockingham Community Service Board ("CSB") was asked at that time by the plaintiff's primary care physician to evaluate the plaintiff for "possible" post-traumatic stress disorder ("PTSD"). (R.329-334.) Based on a "brief interview" and an incomplete history, on May 25, 2006 Dr. Kenneth Wildra, a CSB psychiatrist, reported that he was diagnostically "unsure" about PTSD and likewise "wonder[ed] about various somatic disorders." (R.327-328; *see also* R.346.) Following this very preliminary and indefinite assessment, the CSB's file was closed (R.323), and later medical records contain no indication that the plaintiff sought any further mental health treatment.

7

Pursuant to a state agency request for a consultive psychological assessment, the plaintiff was, however, later seen by Nadia Webb, Ph.D. in late August 2006. (R.350-358.) Based on her interview and the results of her psychological testing, Dr. Webb concluded that the plaintiff had a somatization disorder, an anxiety disorder, and chronic pain with medical and psychological features. She noted that he had a "language barrier," that his ability to work with others was "compromised," that he had been "progressively alienating" those who could help him, and that he and his family were then at risk of homelessness. Globally, she subjectively rated how well he was then at meeting or adapting to daily-living problems at a GAF level of 31.[11] She was "not clear" whether he was malingering. She concluded that he possessed the ability to remember, understand and carry-out simple instructions, that he was "slight[ly]" limited in his ability to interact with the public and others, and that he was "moderate[ly]" limited in his ability to understand, remember and carry-out detailed instructions.

### A.

On the outlined evidence, the ALJ's conclusion that through the date of this decision the plaintiff had no disabling physical impairment is unassailable. Despite the plaintiff's persistent complaints about a myriad of alleged physical maladies, the medical record simply contains no clinical findings or testing results which would support a finding that the plaintiff has a disabling, or even severe, physical impairment. Likewise, the medical record fully supports the ALJ's conclusion that the plaintiff's alleged depression imposed only mild functional limitations.

---

[11] A GAF of 31-40 indicates some impairment in reality testing or communication or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Diagnostic and Statistical Manual of Mental Disorders Fourth Edition*, ("DSM-IV"), 32 (American Psychiatric Association, 1994).

8

**B.**

On appeal the plaintiff focuses on his alleged anxiety and somatoform disorder. It is his basic contention that the ALJ "arbitrarily disregarded" the opinions of treating and examining sources and thereby erroneously concluding his condition neither met nor equaled mental health listings 12.06 [12] and 12.07 [13]. A careful review of the record, however, shows that the varying evidentiary weights assigned by the ALJ to the opinions of treating and examining sources are supported by substantial evidence. Likewise, the record fully supports the ALJ's step-three finding that the plaintiff's condition was not of sufficient severity to meet the "marked" functional limitations required by either of these listings. [14]

In his decision, the ALJ took notice of the plaintiff's reported daily activities (R.23-24.) He considered the absence of any mental health evaluation or treatment of decisional significance before May 2006, two years after the plaintiff contends he became disabled. (R.24-27). He considered the fact that Dr. Iudica made a psychiatric referral for consideration for "possible symptoms" of anxiety or PTSD (R.27), and he noted the cursory nature of Dr. Wildra's initial psychiatric intake evaluation and the preliminary nature of his diagnoses (R.27-28). In considerable detail the ALJ also summarized Dr. Webb's consultive psychological report and among other things noted her expressed "concerns about the validity of [her] evaluation," her conclusion that the plaintiff's reported medical history "did not correspond" to the medical record, her thought that the plaintiff "may have a

---

[12] 20 C.F.R., Part 404, Subpart P, Appx. 1, § 12.06 *Anxiety Related Disorders*.

[13] 20 C.F.R., Part 404, Subpart P, Appx. 1, § 12.07 *Somatoform Disorders*.

[14] As support for the contention that his condition is of listing-level severity, in his brief the plaintiff relies on what he tod Dr. Webb concerning his daily activities and his difficulties maintaining social functioning. (*See* Plaintiff's Brief, p. 10)

9

somatoform disorder" based on the medical record, her limited ability to do any psychological testing due to the plaintiff's "language difficulties," her report that the plaintiff had stopped taking any medications and was unwilling to work with the CSB staff, her concern about the plaintiff's "opiate-seeking behavior," and her conclusion that the plaintiff retained the ability to follow simple instructions and generally to function satisfactorily in a work setting.[15] (R.28-29.)

Explaining his conclusions regarding the plaintiff's residual functional capacity, the ALJ gave significant decisional weight to certain of the exertional limitations reported by the plaintiff to Dr. Iudica; however, he rejected Dr. Iudica's non-exertional limitations which he found to be "refuted by the psychiatric report of Dr. Wildra." (R.28-29.) He gave partial weight to the non-exertional limitations outlined by Dr. Webb in her report; however, he "rejected Dr. Webb's subjective global assessment of the plaintiff's functioning to the extent that it suggested some impairment in reality testing, communication, or a major impairment in several areas, such as the areas of work, family relations, judgment, thinking, or mood and was based on the plaintiff's "subjective reports of his somatic complaints." (R.29-30.)

Therefore, contrary to the plaintiff's contention, the ALJ specifically considered the opinions of Drs. Iudica, Wildra and Webb. He noted the limitations of each, and weighed their opinions. And in accordance with his decisional authority, he resolved the relevant evidentiary conflicts; he made appropriate credibility determinations, and he made the requisite findings of fact. *See, e.g., Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990).

---

[15] *See* R.354-358.

In summary, both the evidentiary weight assigned by the ALJ to the medical opinions upon which the plaintiff seeks to rely and the ALJ's listing-related determinations are supported by substantial evidence in the record. Moreover, they are fully consistent with the medical record viewed in its entirety.

### C.

Although the plaintiff contends that the GAF score of 31 assigned by Dr. Webb is both inconsistent with work and inconsistent with the ALJ's functional limitation findings, this reliance is misplaced. First of all, a specific GAF score is only a "snapshot of a person's functioning at a particular point in time and not a longitudinal indicator of a person's functioning." *See Brown v. Astrue*, 2008 U.S.Dist. LEXIS 105102, *15 n.6 (WDVa, 2008). Second, it is an inherently subjective rating and should not properly be considered medical data. *See Kornecky v. Comm'r. of Social Security*, 167 Fed. Appx. 496, 503 (6th Cir. 2006). And third, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003).

### D.

The plaintiff also argues that the ALJ was affirmatively obligated in this case to obtain *sua sponte* the testimony of a psychiatrist in order to "assess the nature and severity" of his somatoform disorder. Although an ALJ has "a duty to explore all relevant facts and inquire into the issues necessary for an adequate development of the record," he is not obligated to obtain additional information when the record is adequate to make a determination regarding a disability claim. *France v. Apfel*, 87 F.Supp.2d 484, 489-490 (DMd, 2000); *see Cook v. Heckler*, 783 F.2d 1168, 1173,

11

(4th Cir. 1985); *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981); 20 C.F.R. § 404.1512 (e) and § 416.912(e).

Likewise, despite the plaintiff's assertions to the contrary, the medical record fails to suggest any complex medical problem which was not readily understandable by the ALJ. *See Richardson v. Perales*, 402 U.S. 389, 408 (1972), (the use of medical advisors is "primarily in complex cases for explanation of medical problems in terms understandable" to the ALJ). Additionally, there was no suggestion in this record that the testimony of a medical advisor would assist in resolving an ambiguous onset date, clarify the significance of certain clinical or laboratory findings, or otherwise clarify some complex issue during a relevant time period. *See Bailey v. Chater*, 68 F.3d 75, 79 (4th Cir. 1995); Hearings, Appeals and Litigation Law Manual ("HALLEX") I-2-534.

Moreover, the language of the applicable agency regulations concerning an ALJ's use of medical advisors is permissive, not mandatory. Under the applicable regulations, an ALJ permissively "may . . . ask for and consider opinions from medical experts on the nature and severity of [an individual's] impairment(s) and whether . . . [the] impairment(s) equals the requirements of any [listed] impairment." 20 C.F.R. § 404.1527(f)(2)(iii) and § 416.927(f)(2)(iii). The decision to call a medical advisor at the administrative hearing is a matter left to the sound discretion of the ALJ. *See* 20 C.F.R. § 404.1527(f)(2)(iii) and § 416.927(f)(2)(iii); 20 C.F.R. § 404.1529(b) and § 416.929(b); *see also Siedlecki v. Apfel*, 46 F.Supp.2d 729, 732 (N.D. Ohio, 1999). The agency's regulations give the ALJ the discretion to call on a medical advisor, and it is the ALJ's responsibility to review the evidence and resolve any conflicts in the medical evidence. *Siedlecki v. Apfel*, 46 F.Supp.2d at 732.

This argument by the plaintiff is based solely upon the Second Circuit decision in *Perez v. Chater*, 77 F.3d 41, 47 (2nd Cir. 1996), a decision which is not binding on this court. More importantly, it is illogical, given the agency's requirement in 20 C.F.R. § 404.1527(d)(3) and § 416.927(d)(3) that the weight to be given a treating source's opinion depends on the extent to which it is well-supported by clinical and laboratory findings in the record.

Even if it is assumed for the purpose of argument that the ALJ in this case had some obligation to contact a treating physician before discounting or rejecting his or her opinion, the plaintiff has failed to make any showing of prejudice. *See Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (holding that a plaintiff must demonstrate that additional evidence would have been produced by such a follow-up contact with a treating source and that it would have led to a different decision); *Ripley v. Chater*, 67 F.3d 552, 557 n.22 (5th Cir. 1995). Therefore, any assumed error by the ALJ in failing to fulfill any such assumed duty was at most harmless. *See Camp v. Massanari*, 22 Fed. Appx. 311, 311 (4th Cir. 2001) (unpublished).

## V.  Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions and recommendations:

1. All facets of the Commissioner's final decision are supported by substantial evidence;

2. Substantial evidence supports the finding that the plaintiff's condition neither met nor medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appx. 1;

13

3. The ALJ did not err in his review of the plaintiff's physical impairments and associated functional limitations;

4. The ALJ did not err in his review of the plaintiff's mental health impairments and associated functional limitations;

5. Substantial evidence supports the finding that through the date the ALJ's decision, the plaintiff retained the functional ability to perform a range of work at a sedentary exertional level;

6. The medical information and opinions of Dr. Webb were appropriately considered at all relevant decisional steps;

7. The medical information and opinions of Dr. Iudica were appropriately considered at all relevant decisional steps;

8. The medical information and opinions of Dr. Wildra were appropriately considered at all relevant decisional steps;

9. The plaintiff has not met his burden of proving his disability on or before the date of the ALJ's decision; and

10. The final decision of the Commissioner should be affirmed.

## V. Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that an order be entered AFFIRMING the final decision of the Commissioner, GRANTING SUMMARY JUDGMENT to the defendant, DENYING plaintiff's claim, and DISMISSING this case from the docket of the court.

The clerk is directed to transmit the record in this case immediately to the presiding district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## VI. Notice to the Parties

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties**. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

DATED: 3rd day of June 2009.

/s/ *James G. Welsh*
United States Magistrate Judge